**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF NORTH CAROLINA**

| | | |
|---|---|---|
| DELVIN STAFFORD, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:20CV731 |
| | ) | |
| SERGEANT STOUT, et. al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This case comes before the undersigned United States Magistrate Judge for a recommendation on Defendants Captain Rogers, Sergeant Stout, and Officer Land's (collectively, "Defendants") Motion for Summary Judgment (Docket Entry 30 ("Summary Judgment Motion"); <u>see also</u> Docket Entry 31 ("Supporting Brief")) and Motion to Seal (Docket Entry 40). For the reasons that follow, the Court should grant the Summary Judgment Motion in part, deny the Summary Judgment Motion in part as moot, and deny as moot the Motion to Seal.

## I. BACKGROUND

Plaintiff Delvin Stafford, proceeding pro se, commenced this 42 U.S.C. § 1983 ("Section 1983") action against Defendants for alleged violations of his constitutional rights during his 2020 pretrial incarceration at the Guilford County Detention Center. (<u>See generally</u> Docket Entry 1 (the "Complaint"). According to the Complaint, on June 19, 2020, Defendants Land and Rogers assaulted

Plaintiff, and Defendant Stout assisted the other Defendants and did not prevent the assault. (See id. at 6, 13-14.)

Upon initial screening pursuant to 28 U.S.C. § 1915A(a), the Court (per the undersigned United States Magistrate Judge), recommended that the Court allow the excessive force claims against Defendants in their "individual capacity" to proceed. (Docket Entry 3 at 3.)[1] The Court (per United States District Judge William L. Osteen Jr.) adopted that recommendation. (Docket Entry 8 at 1.) Defendants then answered the Complaint, denying allegations of wrongdoing and invoking various affirmative defenses. (See generally Docket Entry 22.)

After the close of discovery, Defendants filed a Notice of Intent to File Dispositive Motions (Docket Entry 27), and then, the Summary Judgment Motion and Supporting Brief (Docket Entry 30; Docket Entry 31). On September 16, 2022, the Clerk sent Plaintiff a letter advising him of his "right to file a 20-page response in opposition . . . within 30 days from the date of service of [Summary Judgment M]otion upon [him]." (Docket Entry 42 at 1.) The letter specifically cautioned Plaintiff that a "failure to respond or . . . file affidavits or evidence in rebuttal within the

---

1 The Court (per the undersigned) recommended that the Court dismiss a claim against a fourth Defendant, a recommendation which the Court (per United States District Judge William L. Osteen Jr.) adopted. (See Docket Entry 8 at 1 (adopting Docket Entry 3 at 3).) By authorizing the Complaint to proceed only as to Plaintiff's individual capacity claims, the Court disposed of any official capacity claim.

2

allowed time may cause the [C]ourt to conclude that [D]efendants' contentions are undisputed and/or that [Plaintiff] no longer wish[es] to pursue the matter," as well as that, "unless [Plaintiff] file[s] a response in opposition to the [Summary Judgment M]otion, it is likely . . . summary judgment [will be] granted in favor of [Defendants]." (Id.)

Despite these warnings, Plaintiff did not respond. (See Docket Entries dated Sept. 16, 2022, to present.) Given that lack of response and the fact that Plaintiff did not verify the factual allegations in the Complaint (see Docket Entry 1 at 12 (certification that "the factual allegations have evidentiary support" for purposes of Federal Rule of Civil Procedure 11)), Plaintiff's bare allegations cannot controvert facts which the Summary Judgment Motion or record establish. See Custer v. Pan Am. Life Ins. Co., 12 F.3d 410, 416 (4th Cir. 1993) (recognizing that party's failure "to respond to a summary judgment motion may leave uncontroverted those facts established by the motion").[2]

As such, the record before the Court reflects the following:

_____

2 By local rule, "[i]f a respondent fails to file a response within the time required . . ., the motion will be considered and decided as an uncontested motion, and ordinarily will be granted without further notice." M.D.N.C. LR 7.3(k). However, the Fourth Circuit requires substantive review of even unopposed motions for summary judgment. See Custer, 12 F.3d at 416 ("[T]he court, in considering a motion for summary judgment, must review the motion, even if unopposed, and determine from what it has before it whether the moving party is entitled to summary judgment as a matter of law.").

According to Plaintiff's unverified Complaint:

On June 19, 2020, at approximately 12:50PM[], [Plaintiff] was out of [his] cell for [his] hour of recreation at the High Point Jail's 7 Max [housing unit] floor. At the time, [Plaintiff] was requesting to be taken downstairs because [he] was feeling side effects from the mental health medication that [he] had been tak[ing] earlier that day. [Plaintiff] had some cleaning solution inside of a cup in [his] left hand as [he] walked over to the officers desk to request to speak to the serge[a]nt. Once Officer Noman and the officer he was training noticed that it was cleaning solution in the cup that [Plaintiff] was drinking[,] one of the officers pulled out his ma[c]e, then told [Plaintiff] to back up. Officer Noman ra[dioed] a code, [and Plaintiff] complied by backing up, but [he] still requested to be taken downstairs.

Moments later, the D-Tac response team entered the 7 Max floor/pod [Plaintiff] was in[] from the lower exit door behind the officer desk, lead [sic] by [Defendant] Stout[,] who had a very aggressive approach. [Defendant Stout] was followed by multiple officers not named as [D]efendants . . . . While [Defendant] Stout was telling [Plaintiff] to lock down, [Plaintiff] tried to explain [his] situation, but [Defendant Stout] put his hands on [Plaintiff] and pushed him . . . to his room, which was upstairs. At this time [Plaintiff] noticed [Defendant] Rogers, [Defendant] Land and three other officers swarm in from the 7 Max upper exit door like they were coming to detain someone.

[Defendant] Stout had his hands on [Plaintiff], pushing [him], forcing [him] to walk faster than a normal pa[ce]. [Defendant Stout] wasn't trying to listen to any of [Plaintiff's] request[s], [and Plaintiff] still had the cleaning solution in [his] hand. . . . [Defendant] Stout continued to force [Plaintiff] to walk up stairs, and [Plaintiff's] shower shoe slipped off some type of way, [and] that[']s when [Plaintiff] felt someone punch [him] in [the] head. When [Plaintiff] look[ed] up, [he] saw [Defendant] Land, then [Defendant Land] punched [Plaintiff] in [his] right eye, then [Defendant Land] hit [Plaintiff] in [his] face again while [Plaintiff] was ducking [his] head, [and] trying to hold on [to] the rails of the stair[case]. One of the officers [then] pulled [Plaintiff] back downstairs by [his] hair, then [Plaintiff] was forced to lay on [his] stomach, face down on the ground w[h]ere [he] was not considered a threat to any of the officers, and [Plaintiff] wasn't resisting.

> . . . . [Plaintiff then] felt someone kick [him], [and]
> lower[] a knee [in]to [his] back and [] legs. When
> [Plaintiff] looked up, [he] could see [Defendant] Rogers
> kicking [Plaintiff ] while the restraints were being secured
> around [Plaintiff's] ank[le]s and [his] hands behind [his]
> back. . . .

(Docket Entry 1 at 13-14.)

In turn, Defendants' evidence reflects:

On June 19, 2020, Officers Noman and Jenkins, both employed at the time as Detention Officers by the Guilford County Sheriff's Office and assigned to the Housing Unit 7 Max at the Guilford County Detention Center, stood near an officer's desk. (See Docket Entry 36 at ¶¶ 1-2, 4.) At approximately 1:25pm, Officer Noman observed Plaintiff "drink a cleaning solution from a Styrofoam cup and approach Officer Jenkins." (Id. at ¶ 5.) "Plaintiff shout[ed] threats towards Officer Jenkins" and requested to pass through a door behind the two officers, "to another portion of the Detention Center." (Id. at ¶ 6.) Plaintiff then approached Officer Jenkins, "who had his pepper spray ready but did not deploy it." (Id. at ¶ 8.) At that point, Officer Noman "called for assistance." (Id.)

At approximately 1:33pm Defendants "responded to a call for assistance in Housing Unit 7 Max." (Docket Entry 33 at ¶ 4; see also Docket Entry 34 at ¶ 4; Docket Entry 35 at ¶ 4.) Defendant Stout "observed Plaintiff standing in front of the officer's desk area . . . approached [him,] and advised him that it was time to return to his cell and lock down." (Docket Entry 34 at ¶ 5.) "Plaintiff initially refused to comply, so [Defendant Stout] placed

5

[his] right hand on the back of [Plaintiff's] jumpsuit to provide a 'soft hands' escort . . . towards the stairs" (id.), but, as Defendant Stout directed Plaintiff towards the stairs which led up to Plaintiff's cell, "Plaintiff tried to walk past the stairs over to the dayroom table" (id. at ¶ 6).

In response, Defendant Stout "took hold of the back of Plaintiff's jumpsuit" (id.), and "Plaintiff started to walk up the stairs" (id. at ¶ 7). Although Plaintiff initially walked up the stairs, he "then began to actively resist by coming to a stop . . . tens[ing] his body[,] and tightly grabb[ing] the handrails while refusing to walk up the stairs." (Id. at ¶ 8.) Defendant Stout attempted to "push[] Plaintiff's upper body forward, but [Plaintiff] continued to resist." (Id.)

At approximately the same time Defendant Stout initially approached Plaintiff by the officer's desk on the first level, Defendant Rogers and Defendant Land "entered Housing Unit 7 Max on its B-Level (second floor)." (Docket Entry 33 at ¶ 5; see also Docket Entry 35 at ¶ 10.) When "Plaintiff refused to walk [up the stairs to his cell] any further, [Defendant Rogers and Defendant Land] proceeded down the stairs toward [] Plaintiff." (Id. at ¶ 6; see also Docket Entry 35 at ¶ 11.) Because Plaintiff gripped the railings on either side of the stairs, Defendant Rogers "took hold of Plaintiff's left arm while [Defendant] Land took hold of his right arm." (Id.; see also Docket Entry 35 at 11.)

6

"Plaintiff [then] became combative and grabbed [Defendant] Rogers by the waist and attempted to push him over the railing." (Docket Entry 34 at ¶ 8.) Plaintiff did so by "mov[ing] to his left and wrapp[ing] his right arm around [Defendant Rogers'] waist." (Docket Entry 33 at ¶ 6.) "Because Plaintiff's actions presented an imminent risk of serious bodily harm to [Defendant] Rogers, [Defendant Land] delivered five closed-fist strikes to Plaintiff's face in order to blur his vision and cause him to release his grip." (Docket Entry 35 at ¶ 12.) Another Officer "also deliver[ed] two closed-fist strikes to Plaintiff's left shoulder area." (Id.)

As a result of these strikes, "[o]fficers were able to secure [Plaintiff's wrists behind his back] with a set of handcuffs." (Docket Entry 33 at ¶ 6.) Defendants and other officers on the stairs "then walked Plaintiff back down the stairs to the first floor of the housing unit and brought Plaintiff to the floor so that [they] could better control his resistant body movements." (Docket Entry 34 at ¶ 10.) Defendant Stout "applied [] shackles to Plaintiff's ankles." (Id.) "Officer Noman then place[d] [a] waist chain around Plaintiff's waist." (Docket Entry 35 at ¶ 16.) As officers placed Plaintiff in full restraints, Defendant Rogers never "str[uck], punch[ed], kick[ed], or tackle[d] Plaintiff." (Docket Entry 33 at ¶ 8.)

7

Once fully restrained, "Plaintiff was assisted to a standing position." (Docket Entry 34 at ¶ 11.) Defendant Stout then "escort[ed Plaintiff] off the floor . . . [to a h]olding [c]ell" (id.) where a nurse "assessed Plaintiff's physical condition[ and] checked [his] restraints to make sure they had not been applied too tightly and did not impede his circulation (id.). "Once the assessment was completed, all Officers and the nurse exited the cell." (Id.)

Defendants also submitted video footage from Plaintiff's housing unit and the body camera of one of the officers involved in the incident. (See Docket Entry 39 at 1.) The housing unit footage, which lacks sound, commences at 1:31:38pm. Officers Noman and Jenkins stand by the officer's desk. Approximately three-foot-high metal fencing frames their station to their right and left. The area in front of the desk leads out to the lower level of 7 Max. Officer Noman positions himself over a computer terminal on the left side of the officer's desk, while Officer Jenkins stands to his right, in front of a door. At 1:31:40pm, Plaintiff walks around a pillar on the lower level, approximately 25 feet in front of and to the right of the officer's desk. At 1:31:45pm, Plaintiff reaches an unattended mop, bucket, and trash can directly to the right of the officer's desk, approximately 10 feet away. At 1:31:49pm, Plaintiff, with his back to Officers Noman and Jenkins, glances toward them over his right shoulder, but they direct their

8

focus toward the computer terminal. At 1:32:11pm, Plaintiff clearly pours the contents of a bottle into a small white cup he holds in his left hand; he appears to empty the bottle, shaking it several times over his cup.

At 1:32:24pm, Plaintiff approaches the officers at the desk. He stands at the corner of the metal fencing which frames the right side of the officer's desk, approximately 4 feet in front of Officer Jenkins, and no more than 6 feet from the door behind Officer Jenkins. From 1:32:38 - 1:32:54pm, Plaintiff appears to alternatingly drink from and gesture with the small cup in his left hand, apparently communicating with the Officers. At 1:32:56pm, he takes two steps towards Officer Jenkins, so that they stand no more than two feet apart. At 1:32:59pm, Plaintiff takes another sip from the cup, and as he brings the cup away from his mouth, he brings it towards the face of Officer Jenkins in one fluid motion. At 1:33:00pm, Plaintiff's outstretched hand holds the cup a matter of inches from Officer Jenkins' face.

Officer Jenkins then takes a step back, and points towards Plaintiff in a gesture that suggests he has directed Plaintiff to back up. As Officer Jenkins does so, Officer Noman turns around to a telephone on the wall behind him, and appears to radio for assistance, hanging up at 1:33:18pm. From 1:33:08 - 1:33:39pm, Officer Jenkins and Plaintiff engage in a discussion; Officer Jenkins' body language (hand outstretched with palm facing towards

Plaintiff) suggests he has told Plaintiff to back up again. At 1:33:40pm, Plaintiff instead takes several steps towards Officer Jenkins, who at that point retrieves his pepper spray from the right side of his belt and shakes it in his right hand several times. At 1:33:45pm, Plaintiff retreats two steps, but then appears to resume his discussion with Officer Jenkins.

At 1:34:24pm, Officer Noman turns to open the door behind Officer Jenkins, and Defendant Stout enters, followed by several officers. From 1:34:27 - 1:34:33pm, Defendant Stout stands directly in front of Plaintiff, and has a brief discussion with him. At 1:34:34pm, Defendant Stout puts his right hand around Plaintiff's left shoulder to the center of his back, and begins to gently push and guide Plaintiff away (to the left, if facing outward from the door) from the officer's desk. Plaintiff, albeit somewhat reluctantly, walks away under his own power.

At 1:34:37pm, Plaintiff and Defendant Stout (whose left hand now rests flat in the center of Plaintiff's back) reach the staircase up to the second level of 7 Max. Plaintiff stops at the bottom of the stairs, and from 1:34:38 - 1:34:41pm, Defendant Stout and one of the other officers gesture up the stairs, clearly directing Plaintiff to walk up to his cell. At the same time, Defendant Land descends three steps from the second level, and beckons towards Plaintiff, but then retreats up the stairs so that Plaintiff and the officers could ascend the stairs. Defendant

10

Rogers and two other officers stand on the second level of 7 Max behind Defendant Land.

Instead of ascending the stairs, at 1:34:42pm, Plaintiff begins walking away to the left of the staircase, towards the dayroom, in which sits a table and three chairs, all bolted to the floor. At 1:34:43pm, Defendant Stout grabs the lower back region of Plaintiff's jumpsuit, and pulls him back towards the staircase. At 1:34:46pm, Defendant Stout begins guiding Plaintiff up the stairs; Defendant Stout clutches the fabric on the back of Plaintiff's jumpsuit with his left hand, and his left forearm presses into Plaintiff's lower back to ensure Plaintiff climbs the stairs. From 1:34:47 - 1:34:56pm, Plaintiff and Defendant Stout climb five steps of the approximately 14-step staircase. Plaintiff moves slowly, and frequently leans his head back over his right shoulder to communicate with Defendant Stout.

At 1:34:56pm, Plaintiff stops climbing the stairs. He braces his body in place by sticking his arms out in front of him and to the sides, grasping a side railing in each hand. At 1:34:58pm, Defendant Stout and another officer visibly press into Plaintiff's upper back, but Plaintiff does not budge. At 1:35:02pm, Defendant Stout manages to push Plaintiff up two additional steps. At the same time, Defendant Rogers descends the staircase from the second level, followed by Defendant Land. At 1:35:03pm, everyone converges approximately halfway up the staircase; Plaintiff and

11

Defendant Rogers, who face each other, appear to stand greater than 10 feet above the ground below.

At 1:35:04pm, Plaintiff again grasps the side railings with each hand, rooting himself in place despite pushing from the officers below him. At 1:35:05pm, Defendant Rogers grabs Plaintiff's left hand with both of his hands, and tries to dislodge it from the left railing. At 1:35:08pm, Defendant Land does the same with Plaintiff's right hand on the right railing. At 1:35:09pm, Defendants Rogers and Land appear to have successfully removed Plaintiff's hands from the railings.

Then, at 1:35:11pm, Plaintiff's body lurches to the left, and Plaintiff's left shoulder presses under the left armpit into the left ribcage of Defendant Rogers. Defendant Rogers still holds Plaintiff's left arm out to the side, but the tangle of bodies obscures the view of Plaintiff's right arm, although Defendant Land appears to have a hold on Plaintiff's right elbow. From 1:35:11 - 1:35:14pm, Defendants struggle with Plaintiff while his left shoulder continues to press into the side of Defendant Rogers. For these seconds, Defendant Rogers' entire torso hangs over the side of the railing, which rises to his hip level.

At 1:35:15, Defendant Land begins delivering closed-fist strikes with his right hand to the right side of Plaintiff's face. He appears to deliver a total of four or five blows over the course of four seconds. At 1:35:18pm, another officer standing behind

12

Defendant Stout delivers two strikes to Plaintiff's left shoulder blade region, but this officer must reach past Defendant Stout and around Defendant Rogers to deliver the strikes, limiting their impact.

By 1:35:20pm, officers have secured Plaintiff's hands behind his back, and Defendant Rogers begins dragging Plaintiff back down the staircase. Defendant Rogers' left arm hooks around Plaintiff's left elbow; other officers hold Plaintiff's hands and the back of his jumpsuit, while at the same time securing Plaintiff's wrists behind his back with handcuffs. At 1:35:29pm, as the officers bring Plaintiff to the floor at the bottom of the staircase, the metal glint of a handcuff appears visible on Plaintiff's right wrist before he and the officers disappear from view of the security cameras.

To supplement the housing unit footage, Defendants also submitted footage from the body-worn camera of one of the responding officers. (See Docket Entry 39.) The beginning time-stamp of this footage, 12:08:39pm, reflects an obvious error (see Docket Entry 31 at 10 n.1), so future references to the footage will not include the time. However, at the start of the footage, Plaintiff lies face-down at the bottom of the stairs with his wrists handcuffed behind his back but no other form of restraints, suggesting little time has elapsed since the conclusion of the housing unit footage.

13

As the footage begins, one officer secures Plaintiff's ankles with shackles, while two other officers use one of their feet to apply pressure to each of Plaintiff's legs to hold them in place. Then, another officer wraps a chain around Plaintiff's waist. To this point, the body camera footage lacks sound.

The audio starts as officers continue to wrap Plaintiff's waist in a chain. Plaintiff exclaims, "[y]'all just f[-----] up, on God. Y'all better hide me, on God. . . . First one of y'all I get [inaudible], I'm[ going to] beat your a[--]." An officer responds, "[s]top threatening us." Plaintiff continues to swear at and threaten officers as they remove one set of handcuffs and cuff Plaintiff's wrists to the waist chain. At this point, one officer still has his left foot on the back of Plaintiff's left thigh, but does not appear to apply much weight to Plaintiff's leg. No other officer makes contact with Plaintiff, beyond the officers working on Plaintiff's wrists and waist chain. Plaintiff remarks (apparently to Defendant Land) that "[he] hit[s] like a sweet-tart, on Jesus," and, apparently trying to goad Officers into a physical altercation, tells them that they just need to "get [him] up" and "loosen his m[-----]f[-----] ankles, bruh."

Approximately two-and-a-half minutes after the body camera footage begins, Defendant Rogers and another officer pull Plaintiff to his feet by grabbing each of his arms. At least in the body camera footage, Defendant Rogers at no point kicked or otherwise

14

struck Plaintiff.  And Plaintiff, who made no shortage of comments while lying on the ground, never remarked that someone kicked him, or accused Defendant Rogers of striking him.

Officers then walk Plaintiff into a holding cell, where a small green mat (perhaps five feet long by two feet wide) sits on the floor against the right wall.  Officers have Plaintiff kneel on the mat facing the wall, and inform him that a nurse will arrive shortly to check his restraints.  Plaintiff asks to lay down, but officers tell him to remain on his knees until the nurse checks him out.  Plaintiff next describes the altercation as "blessings on blessings," and tells the officer holding him to "tell ol' buddy that he hits like a b[----]."

Approximately two minutes after officers bring Plaintiff into the holding cell, the nurse arrives.  The nurse, in checking the restraints on both Plaintiff's wrists and ankles, can move the cuffs up and down, contradicting Plaintiff's statement to the nurse that "they are too tight.  Can you tell [the officers] to loosen them, ma'am?"  The nurse then asks Plaintiff if "[he is] having any pain?  Is it just [his] right eye?"  Plaintiff responds, "oh no, it's [his] back, [his] lower back . . . [his] genitalia] . . . [his] head . . . [his] ankles . . . everyt[h]ing."  The nurse then leaves the holding cell to get something for Plaintiff's pain, which he rated a "20" out of 10.  As officers lay Plaintiff down on his right side, and start to leave the room, Plaintiff calls out while

15

laughing, "look at y'all. Scared." Plaintiff then loudly laughs to himself as officers close the door to his holding cell, and the footage concludes.

## II. DISCUSSION

### A. Summary Judgment Standards

"The [C]ourt shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). The movant bears the burden of establishing the absence of such dispute. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). In analyzing a summary judgment motion, the Court "draw[s] all reasonable inferences in favor of the non-moving party. Emmons v. City of Chesapeake, 982 F.3d 245, 250 (4th Cir. 2020). However, "[u]nsupported speculation is not sufficient to defeat a summary judgment motion." Felty v. Graves-Humphreys Co., 818 F.2d 1126, 1128 (4th Cir. 1987). Rather, the Court must "find that a reasonable jury could return a verdict for [the nonmoving party in order for] a genuine factual dispute [to] exist[] . . . ." Evans v. Technologies Applications & Serv. Co., 80 F.3d 954, 959 (4th Cir. 1996). A reasonable jury could not return a verdict for the nonmoving party when "videotape [evidence] quite clearly

16

contradicts the version of the story told by [the nonmoving party]." <u>Scott v. Harris</u>, 550 U.S. 372, 378 (2007).

<u>B. Excessive Force</u>

Both pretrial detainees and convicted prisoners possess constitutional protections against an officer's use of excessive force: a convicted prisoner under the Cruel and Unusual Punishment Clause of the Eighth Amendment and a pretrial detainee under the Due Process Clause of the Fourteenth Amendment. <u>See</u> <u>Kingsley v. Hendrickson</u>, 576 U.S. 389, 400 (2015); <u>see also, e.g.</u>, <u>Graham v. Connor</u>, 490 U.S. 386, 395 n.10 (1989) (explaining that, "[a]fter conviction, the Eighth Amendment serves as the primary source of substantive protection . . . in cases . . . where the deliberate use of force is challenged as excessive and unjustified," but "that the Due Process Clause protects a pretrial detainee from the use of excessive force that amounts to punishment" (internal quotation marks omitted) (ellipses in original)). "The language of the two Clauses differs, and the nature of the claims often differs. And, most importantly, pretrial detainees (unlike convicted prisoners) cannot be punished at all, much less 'maliciously and sadistically.'" <u>Kingsley</u>, 576 U.S. at 400. Accordingly, to succeed on an excessive force claim, "a pretrial detainee must show only that the force purposely or knowingly used against him was objectively unreasonable." <u>Id.</u> at 396–97.

The Supreme Court identified certain considerations that "may bear on the reasonableness or unreasonableness of the force used," id. at 397, namely:

> the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting.

Id. Courts must assess objective reasonableness "from the perspective of a reasonable officer on the scene, including what the officer knew at the time, not with the 20/20 vision of hindsight." Id. Courts must also account for the government's legitimate interests in managing the facility, "appropriately deferring to policies and practices that in th[e] judgment of jail officials are needed to preserve internal order and discipline and to maintain institutional security." Id. (brackets in original) (internal quotation marks omitted).

Further, in assessing objective reasonableness, a court should view the use of force "in full context, with an eye toward the proportionality of the force in light of all the circumstances." Smith v. Ray, 781 F.3d 95, 101-02 (4th Cir. 2015) (internal quotation marks omitted) (reiterating rejection of "argu[ment] that [courts] should take a 'segmented view of the sequence of events' and hold that each step taken by the officer was reasonable based on [the plaintiff's] immediately preceding actions").

18

Nevertheless, "[i]n considering the reasonableness of an officer's actions, [the Court] must consider the facts at the moment that the challenged force was employed." Id. at 101. Notably, "the reasonableness of force employed can turn on a change of circumstances during an encounter lasting only a few seconds." Harris v. Pittman, 927 F.3d 266, 274 (4th Cir. 2019) (internal quotation marks omitted). In this regard, the United States Court of Appeals for the Fourth Circuit "ha[s] made clear that the justification for using protective force expires at the very moment a threat is neutralized." Dean v. Jones, 984 F.3d 295, 305 (4th Cir. 2021) (explaining that, "[o]nce [the plaintiff] was subdued and [the defendant officer] no longer had reason to fear for officer or public safety, the use of force became unnecessary and unjustified — even if all of that transpired merely seconds after [the plaintiff] head-butted [the defendant officer]"); see also, e.g., Waterman v. Batton, 393 F.3d 471, 481 (4th Cir. 2005) ("[F]orce justified at the beginning of an encounter is not justified even seconds later if the justification for the initial force has been eliminated.").

### Defendant Land

In light of "all the circumstances," Smith, 781 F.3d at 102, Defendant Land's four to five closed-fist strikes to Plaintiff's face "w[ere not an] objectively unreasonable [use of force]." Kingsley, 576 U.S. at 397. First, an appropriate relationship

19

existed "between the need for the use of force and the amount of force used." Id. at 397. In the housing unit footage, immediately before Defendant Land strikes Plaintiff, Plaintiff's body lurches to the side into Defendant Rogers. "At the moment that the challenged force was employed [by Defendant Land]," Smith, 781 F.3d at 101, Defendant Rogers leaned dangerously over the railing of the staircase, at least 10 feet above the ground below. As a result, "[t]he subsequent restraining measures were necessary to subdue [Plaintiff and protect Defendant Rogers]." Grayson v. Peed, 195 F.3d 692, 696 (4th Cir. 1999) (holding that members of cell-extraction team, who punched inmate "seven to nine times" as inmate resisted move to different cell, did not display excessive force).

As Defendant Land attested, "[he] believed [Defendant Rogers] was in danger of being pushed by [] Plaintiff over the handrail, which would have caused Captain Rogers to seriously injure himself by falling head-first or upper torso-first onto the steel table or hard floor below." (Docket Entry 35 at ¶ 12.) Defendant Land therefore used "five closed-fist strikes . . . to blur [Plaintiff's] vision and cause him to release his grip from around [Defendant Rogers]." (Id.) The temporal connection between Plaintiff's contact with Defendant Rogers and Defendant Land's delivery of several punches, coupled with the fact that Defendant Land ceased striking Plaintiff as soon as Defendant Rogers regained his balance on the staircase, demonstrates that an appropriate

20

relationship existed "between the need for the use of force and the amount of force used." Kingsley, 576 U.S. at 397.

The second Kingsley factor, the extent of Plaintiff's injury, favors neither Plaintiff nor Defendants. Plaintiff alleges he suffered "a black eye," blurred vision, and "dots" in his vision. (See Docket Entry 1 at 6.) Courts have categorized similar injuries as "minimal." See Ellenburg v. Henderson Cnty. Jail, No. 1:14CV290, 2016 WL 1354980, at *4 (W.D.N.C. Apr. 5, 2016) (describing "two black eyes and a crooked nose" and "a cut [from] taser prongs" as "minimal"). But, even if the Court considered Plaintiff's injuries serious, "excessive force claims [should be analyzed] based on the nature of the force rather than the extent of the injury." Wilkins v. Gaddy, 559 U.S. 34, 34 (2010).[3]

The third Kingsley factor (any effort made by the officer to temper or to limit the amount of force) strongly favors Defendant

---

3 Because the extent of Plaintiff's injuries do not alter the outcome of his excessive force claim, the Court need not examine Plaintiff's medical records, submitted by Defendants under seal (Docket Entry 41) to resolve his claim. Defendants did not, in any event, submit said records to shed light on the extent of Plaintiff's injuries, but rather to counter Plaintiff's statement that he "didn't receive any medical treatment." (Docket Entry 1 at 6.) Upon initial screening, the Court did not permit Plaintiff's claim for "ineffective medical assistance" (id. at 4) to proceed (see Docket Entry 8 at 1 (adopting Docket Entry 3 at 3)), so Plaintiff's medical records lack relevance to the Summary Judgment Motion. Moreover, Plaintiff failed to respond to the Summary Judgment Motion, where he could have (1) argued that his ineffective medical assistance claim survived initial screening or (2) argued that his medical records shed light on the extent of his injuries for his excessive force claim.

Land.  As mentioned previously, Defendant Land ceased striking Plaintiff as soon as Defendant Rogers regained his balance on the staircase.  Thus, "[t]here is no indication in the [housing unit] [v]ideo that [Defendant Land]'s use of force was gratuitous." LaFever v. Clarke, 525 F. Supp. 3d 305, 335 (N.D.N.Y. 2021); see also Ellenburg, 2016 WL 1354980, at *4 (finding no excessive force because "when the fighting stopped, no additional force was employed").  "[T]he justification for using protective force expires at the very moment a threat is neutralized," Dean, 984 F.3d at 305, and so here too did Defendant Land's use of force.

"The fourth and fifth Kingsley factors (the severity of the security problem at issue, and the threat reasonably perceived by the officer) further favor Defendant [Land], as Plaintiff's unrestrained, combative behavior presented an objectively severe security threat and danger to the safety of Defendant [Rogers] and others." Haizlip v. Alston, No. 1:14CV770, 2016 WL 4184426, at *15 (M.D.N.C. Aug. 5, 2016).  As the housing unit footage makes apparent, Plaintiff behaved erratically and unpredictably during this encounter.  He approached Officers Noman and Jenkins, shoved a cup of cleaning solution into the face of Officer Jenkins, and refused to follow orders to back down.  When Defendant Stout arrived, and attempted to guide Plaintiff up to his cell, Plaintiff veered out of Defendant Stout's control into the dayroom.  When Defendant Stout finally caused Plaintiff to ascend a series of

stairs, Plaintiff then grasped the railings, impeding his movement. Finally, when Defendants Rogers and Land descended the stairs to assist, the resulting scuffle nearly concluded with Plaintiff knocking Defendant Rogers over the railing from a dangerous height.

In sum, "Defendants reasonably perceived a threat given Plaintiff's continuous refusal to comply; and Plaintiff actively resisted." Skinner v. Sproul, No. 1:14-CV-174, 2016 WL 796015, at *13 (M.D. Ga. Feb. 26, 2016). In that regard, "the sixth Kingsley factor (whether the plaintiff actively resisted) also favors Defendant [Land]. In short, the undisputed evidence establishes that Plaintiff actively resisted Defendant [Stout]'s attempts to escort him back to [his cell] by [grasping onto the railings] and attempting to engage Defendant[s] [Rogers and Land] in a physical altercation." Haizlip, 2016 WL 4184426, at *15. Taken together, and in view of all record evidence, no reasonable juror could conclude that "the force purposely or knowingly used against [Plaintiff] was objectively unreasonable." Kingsley, 576 U.S. at 396–97. Plaintiff's unverified allegations to the contrary do not suffice at this stage. See Custer, 12 F.3d at 416. Accordingly, the Court should grant summary judgment in favor of Defendants as to the claim of excessive force by Defendant Land.

### Defendant Rogers

The record similarly establishes the absence of a genuine issue of material fact as to the allegedly excessive nature of the

force Defendant Rogers used on Plaintiff. (See Docket Entry 1 at 14 (alleging that, "[w]hen [Plaintiff] looked up, [he] could see [Defendant] Rogers kicking [him]").) In fact, "[t]he videotape quite clearly contradicts the version of the story told by [Plaintiff]." Scott, 550 U.S. at 378. As the body camera footage begins, two officers use one of their feet to apply pressure to each of Plaintiff's legs to hold them in place as a third officer applies shackles to Plaintiff's ankles. But neither officer appears to apply much pressure (Plaintiff no longer aggressively resists at this point), and neither officer kicks Plaintiff or stomps on his leg.

Approximately two-and-a-half minutes after the body camera footage begins, Defendant Rogers pulls Plaintiff to his feet. Defendant Rogers at no point in the footage kicked or otherwise struck Plaintiff. And Plaintiff, who (as noted previously) made no shortage of comments while lying on the ground, never remarked that someone kicked him, or accused Defendant Rogers of striking him.

Plaintiff, by means of his **_unverified_** allegations in the Complaint (see Docket Entry 1 at 14), tells one story; however, "[t]he videotape tells quite a different story," Scott, 550 U.S. at 379. "At the summary judgment stage, facts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." Id. Plaintiff has come forward with no evidence that Defendant Rogers kicked or struck

Plaintiff as alleged in the Complaint. Defendant Rogers has attested that "at no time did [he] ever strike, punch, kick, or tackle Plaintiff, nor did [he] use any type of weapon against him." (Docket Entry 33 at ¶ 8.) Furthermore, the video evidence bears out that attestation. As a result, even if Plaintiff had verified the allegations in the Complaint, his claim against Defendant Rogers would fail as a matter of law: "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." Scott, 550 U.S. at 379. For all of these reasons, the Court should grant summary judgment in favor of Defendants as to the claim of excessive force by Defendant Rogers.

*Defendant Stout*

Plaintiff finally contends that Defendant Stout stood idly by as "his subordinate(s) . . . engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury." (Docket Entry 1 at 6.) Having concluded that neither Defendant Land nor Defendant Rogers caused Plaintiff constitutional injury, the Court should decline to hold Defendant Stout liable on a bystander theory of Section 1983 liability, because he could not have "know[n] that a fellow officer [wa]s violating [Plaintiff's] constitutional rights." Randall v. Prince George's Cnty., Md., 302 F.3d 188, 204

25

(4th Cir. 2002). The Court should therefore grant summary judgment in favor of Defendants as to the claim against Defendant Stout for bystander liability.

## C. Medical Claims

Defendants also moved for summary judgment on "Plaintiff's Medical Claims." (See Docket Entry 31 at 19-21.) But this Court (per Judge Osteen adopting the recommendation of the undersigned) only allowed Plaintiff's excessive force claims to proceed past the screening stage. (See Docket Entry 3 at 3.) No live claim remains for inadequate medical treatment, and Plaintiff failed to respond to the Summary Judgment Motion to assert otherwise. Accordingly, the Court should deny as moot Defendants' Summary Judgment Motion as it relates to any medical claims.

## III. Motion to Seal

In connection with their Summary Judgment Motion, Defendants filed under seal several of Plaintiff's medical records from his time at Guilford County Detention Center. (See Docket Entry 38-1.) Defendants also filed a Motion to Seal, stating that the medical "records are subject to the 'privacy rule' under the Health Insurance Portability and Accountability Act of 1996 (HIPAA) . . . [although] Defendants firmly believe that Plaintiff has placed his medical condition squarely at issue in his lawsuit (and thus waived any credible claim of confidentiality to these medical records)." (Docket Entry 40 at 1-2.)

26

The public enjoys "a general right to inspect and copy public records and documents, including judicial records and documents." Nixon v. Warner Commc'ns, Inc., 435 U.S. 589, 597 (1978). "[D]ocuments filed with the court are judicial records if they play a role in the adjudicative process, or adjudicate substantive rights." In re Application of U.S. for an Ord. Pursuant to 18 U.S.C. Section 2703(d), 707 F.3d 283, 290 (4th Cir. 2013) (internal quotation marks omitted). Materials that accompany a summary judgment motion typically constitute judicial records because "[a] summary judgment motion requires a district court to examine the entire record, including affidavits and materials beyond the pleadings, to determine whether there is a genuine issue of any material fact and whether the movant is entitled to judgment as a matter of law." In re Pol'y Mgmt. Sys. Corp., 67 F.3d 296 (4th Cir. 1995).

But here, Defendants submitted Plaintiff's health records to support their Summary Judgment Motion as it related to "Plaintiff's Medical Claims" (Docket Entry 31 at 19; see id. at 19-21). Because, as previously documented, this case proceeded past screening only on Plaintiff's excessive force claims, Plaintiff's medical records bear no relevance on any issue for resolution at summary judgment, and the Court need not examine them. See Trustees of Purdue Univ. v. Wolfspeed, Inc., No. 1:21CV840, 2022 WL 3226730, at *4 (M.D.N.C. Aug. 10, 2022) (holding that, because

27

"exhibit plays no role in this court's adjudication . . .
presumption [of public access] does not attach to that exhibit").
Simply put, Plaintiff's medical records "play [no] role in the
adjudicative process." In re Application, 707 F.3d at 290. Rather
than wade into thorny issues of patient privacy, the Court should
instead conclude that the public right of access does not attach to
these non-adjudicative documents, deny the Motion to Seal as moot,
and direct the Clerk to remove Plaintiff's medical records (in
unredacted format at Docket Entry 41) from the Docket.

## CONCLUSION

Because the record lacks evidence from which a reasonable
fact-finder could conclude that Defendants subjected Plaintiff to
excessive use of force, Defendants have shown entitlement to
judgment as a matter of law.

**IT IS THEREFORE RECOMMENDED** that the Summary Judgment Motion
(Docket Entry 30) be granted in part and denied in part as moot,
that the Motion to Seal (Docket Entry 40) be denied as moot, and
that Plaintiff's medical records (Docket Entry 41) be stricken.

This 19th day of April, 2023.

                              /s/ L. Patrick Auld
                          **L. Patrick Auld**
                    **United States Magistrate Judge**

28